IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 07, 2015 Session

**IN RE JAMIE G.**

**Appeal from the Juvenile Court for Davidson County**
**No. 169539      Sophia Brown Crawford, Judge**

**No. M2014-01310-COA-R3-PT – Filed May 29, 2015**

In this termination of parental rights case, Mother appeals the trial court's findings of abandonment by willful failure to support and the persistence of conditions as grounds for termination. Mother also appeals the trial court's conclusion that termination was in the child's best interest. Pre-adoptive parents appeal the trial court's decision declining to find the ground of willful failure to visit. We affirm the trial court's findings of willful failure to support and persistent conditions. Further, albeit for different reasons, we affirm the trial court's decision declining to terminate Mother's parental rights on the ground of willful failure to visit. We also affirm the trial court's finding that termination is in the child's best interest, and therefore, affirm the termination of the Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and KENNY ARMSTRONG, J., joined.

Nicholas Perenich, Jr., Nashville, Tennessee, for the appellant, Heidi G.

Jacqueline B. Dixon, Nashville, Tennessee, for the appellees, Steven C. and Kathryn C.

Cynthia H. Moore, Nashville, Tennessee, Guardian Ad Litem.

**OPINION**

**Background**

In November 2007, Jamie G.[1] ("Jamie" or "the child") was born to Heidi G. ("Mother") in Nashville, Tennessee.[2] Jamie was born with several abnormalities or disabilities, including Tetralogy of Fallot[3] and DiGeorge's Syndrome.[4] After he was born, Jamie lived with Mother in Davidson County, Tennessee. Mother also had three other children, all of whom she had custody of at the time of Jamie's birth. Mother's other children include Autumn G., Austin G., and Cy G. Both Austin and Cy had some special needs involving learning and behavioral issues. Although the proceedings concerning Mother's parental rights to Jamie did not begin until January 2013, Mother has a lengthy history with the Department of Children's Services ("DCS") that dates back to 2008.

On January 11, 2008, DCS filed a Petition for Custody with Request for Emergency Removal and Request for Child Support in the Davidson County Juvenile Court. The petition sought to remove the children from the legal custody of Mother. Jamie was two months old when the petition was filed. DCS's petition asserted that Mother had several untreated mental health issues and became violent against maternal grandmother ("Grandmother"), whom Mother and the children lived with at the time. The record indicates that Grandmother contacted DCS indicating that Mother had become "very destructive and has a tendency to tear the house up when she becomes upset." As a result of this petition, the children entered DCS custody.

---

[1] In cases involving minor children, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] The parental rights of Jamie's biological father were also terminated by the trial court; however, he did not appeal. Accordingly, Mother is the sole appellant in this case.

[3] Tetralogy of Fallot is defined as:

> [A] congenital heart anomaly . . . The primary symptoms in the infant are . . . difficulty in feeding, failure to gain weight, and poor development. In older children a typical squatting position and clubbing of the fingers and toes are evident. A pansystolic murmur is usually heard, and the second heart sound is faint or absent. . . .

*Mosby's Medical, Nursing, & Allied Health Dictionary* 1603 (5th ed. 1998). In the record, the parties refer to Jamie's condition as a "hole in his heart."

[4] DiGeorge's Syndrome is defined as "a congenital disorder characterized by severe immunodeficiency and structural abnormalities, including hypertelorism; notched, low-set ears; small mouth; downward slanting eyes; cardiovascular defects; and absence of the thymus and parathyroid glands." *Mosby's Medical, Nursing, & Allied Health Dictionary* 488 (5th ed. 1998). "[H]ypertelorism" means "a developmental defect characterized by an abnormally wide space between organs or parts." *Id.* at 794. A common type of hypertelorism is "ocular hypertelorism," which is an abnormally wide space between the eyes. *Id.* at 1137.

After a hearing on February 20, 2008, before the Juvenile Court of Davidson County, the juvenile court entered its Agreed Order of Adjudication and Disposition. This order adjudicated Jamie, along with his siblings, dependent and neglected "because of [Mother's] ongoing mental health issues and her failure to take medication consistently." The juvenile court also found that Mother's instability led to her inability to provide sufficient housing for the children and also led to the conflict with Grandmother. The juvenile court noted that Mother had admittedly used marijuana at the time DCS filed its petition in January 2008. Ultimately, the juvenile court approved an agreement between the parties providing that Grandmother would be awarded temporary custody of Jamie and Autumn. Custody of the other two children, Austin and Cy, was awarded to Catherine P., who is their maternal aunt. The court ordered Catherine P. to supervise all of Mother's visitation with the children, which was to occur at Catherine P.'s house. From a practical standpoint, it is unclear whether Mother's visitation with Jamie at this point only occurred under Catherine's supervision because Jamie resided in Grandmother's home with Mother. The juvenile court's order provided that it was the court's "standard practice to allow a one year time frame within which the parent will be given the opportunity to remedy the conditions that necessitated foster care placement or temporary legal custody being granted to a relative." To this end, the court stated that Mother had one year (until January 2009) to "rehabilitate [her] circumstances." As discussed in detail *infra*, although there were a multitude of proceedings concerning the children over the next several years, after this order was entered, Jamie was never returned to Mother's custody.

Following the entry of the juvenile court's order, the juvenile court continued to monitor whether Mother was making progress. In November 2008, Mother entered Family Treatment Court, where she tested negatively on drug screens for several months. Mother, Grandmother, and Jamie continued to live together for nearly two years. Upon additional review by the juvenile court, the juvenile court entered an order on September 10, 2009, stating that "[u]sually when a commitment to sobriety is present, other aspects of a client's life fall into place. Unfortunately, that has yet to be the case." The juvenile court noted that Mother was still unemployed and lacked her own residence or a plan to pay for her own residence. The court also found that it was unlikely she would be able to care for the children without Grandmother's assistance and also found that she "does not seize an active parenting role for her children."[5] The juvenile court afforded Mother sixty days from the entry of this order to demonstrate to the court that she desired to be the children's primary caregiver.

---

[5] The court noted that Mother did not know where Cy G. attended school and that she did not regularly attend the doctor's appointments for her special needs children.

After the expiration of the sixty days, on November 6, 2009, the juvenile court entered another order reviewing Mother's progress and finding that it was not in the children's best interest to be in the custody of Mother. While the court noted that Mother had made sincere, but unsuccessful, attempts at obtaining employment, the court found that Mother did not have the "temperament, patience, or consistency" to parent the children, especially in light of Jamie and Austin G.'s special needs.[6] Ultimately, this order terminated Mother's involvement with the Family Treatment Court. The court placed legal custody of three of the children (Austin G., Cy G., and Jamie) with Grandmother,[7] but put no restrictions upon Mother's visitation. Finally, the court reminded Mother that she was "free to file a petition for a return of custody when she sees fit to do so."

Jamie and his two brothers lived with Grandmother from February 20, 2008, the date of the initial grant of custody to Grandmother, until she passed away on June 7, 2011. Shortly before Grandmother passed away, in May 2011, she contacted Kathryn C. and Steven C. (together, "Appellees") to give them a power of attorney over Jamie. Kathryn C. worked for an organization that provided in-home development therapy and other services to Jamie at Grandmother's home. Before Grandmother passed away, she attended a court appearance where both Mother and Appellees were present. At this time, the court granted legal custody of Jamie to Appellees.[8] Mother made no objection at this time to the transfer of legal custody to Appellees. Shortly thereafter, on June 7, 2011, Grandmother passed away.

After Grandmother's death, several petitions were filed concerning legal custody of the four children. Appellees filed a petition for custody of Jamie. The paternal grandparents filed a petition for custody of Austin G. and Cy G. The maternal grandfather, Richard B., ("Grandfather") filed a petition for custody of all four children. The children's Guardian ad Litem ("GAL") filed a petition for Catherine P. to have custody of Autumn G. Finally, Mother filed a petition for a return of custody, citing a material change in circumstances.

On August 2, 2011, the juvenile court held a trial on all of the above petitions. The juvenile court entered an order on September 2, 2011. The court dismissed Mother's petition based on her failure to prove a material change in circumstances. Moreover, the court stated that Mother failed to remedy the conditions warranting removal of the children

---

[6] Austin suffered from behavioral issues related to autism.

[7] At some point, Mother was convicted of felony child abuse against her daughter, Autumn. The record indicates that Autumn, at this point, resided with Catherine P., but does not indicate what conduct on Mother's part was the basis for this conviction.

[8] After Grandmother's death, Austin G. and Cy G. went to live with their paternal grandparents. Autumn G. remained with Catherine P., Mother's sister.

originally. At this time, Mother remained unemployed and lacked housing, transportation, and a driver's license. The court also found that Mother had removed herself from medications used to treat her mental health issues. Additionally, Mother had incurred domestic assault charges just several months prior to the hearing. Accordingly, the juvenile court awarded legal custody of Jamie to Appellees; legal custody of Austin G. and Cy G. to the paternal grandparents; and legal custody of Autumn G. to Catherine P. Mother was limited to once-per-month visitation with all the children and telephone visitation twice per week. The court specifically noted:

> [I]f she misses the visitation, then the Court may stop the visitation. If the visits go well and the Mother makes good progress on her individual issues, the Court will increase her visitation. Specifically, the Court again advised the Mother she needs to obtain stable housing, transportation, employment, alcohol and drug sobriety and mental health stability.

Several months after the court's grant of custody to the Appellees, on March 15, 2012, the Appellees filed a request against Mother for child support for Jamie. The court entered an order requiring Mother to pay child support to the Appellees in the current amount of $285.00 per month and retroactive support in the amount of $1,995.00, totaling $328.33 per month. The record indicates that Mother failed to pay support as ordered; however, Mother did begin paying some support after Appellees filed their petition to terminate her rights. Ultimately, she made seven payments totaling $989.55 for the period between March 26, 2013, and June 17, 2013. She also made two payments totaling $168.11 for the period between July 1, 2013 and July 15, 2013.

It appears that the visitation ordered by the court on September 2, 2011, continued until July 2012, when the Appellees filed a Motion to Suspend and/or Modify Mother's Visitation based on an alleged outburst of Mother at a recent visitation. On September 13, 2012, the juvenile court magistrate entered a written order specifically stating that it was "not terminating Mother's visitation but leaving it in Mother's control based on the fact that continued visitation will only occur once Mother is able to demonstrate compliance with the directives in the Court's Order of September 2, 2011," wherein the court ordered Mother to address her issues with employment, transportation, and mental health. The juvenile court also ordered Mother to obtain a mental health assessment before she could seek a modification of this order.

On January 28, 2013, Appellees filed a petition to terminate Mother's parental rights on several grounds: abandonment by willful failure to visit, abandonment by willful failure to support, persistence of conditions, and incompetency. At some point prior to this filing, Mother had appealed the magistrate's September 13, 2012, order purporting to

modify her visitation to the juvenile court. Mother had no visitation with Jamie while her appeal was pending. After a hearing on January 29, 2013, the juvenile court revised its order and permitted Mother to have visitation with Jamie on two separate dates in February and March.

The juvenile court held a trial on Appellees' termination petition on various dates between July 15, 2013, and May 18, 2014. Jamie was six years old at the start of trial. As can be expected, much of the testimony concerned the circumstances surrounding Mother's alleged failure to exercise visitation with Jamie, her alleged failure to financially support Jamie, and her alleged failure to remedy the conditions that warranted Jamie's removal from her custody initially.

Regarding visitation with Jamie, Mother testified that she was under the impression that her visitation with Jamie was suspended by the juvenile court magistrate's September 13, 2012, order, discussed *supra*. She also testified that, in response to the purported suspension of her visitation, she "appealed" the September 13, 2012, order to the juvenile court judge, who then reinstated visitation by order entered February 20, 2013. Mother also recounted various times where she had visited with the child while he was in Appellees' custody.

Mother also testified that she had been arrested in connection with several episodes of domestic violence. Sometime in 1998, Mother pleaded guilty to a charge of child abuse. Mother's sister, Catherine P., called the police and alleged that Mother had picked up her sister's child by his neck and threw him across the room. Mother testified that she did not pick him up by his neck, but she did pick him up "by his overalls, and I sat him. I did not toss him." She testified that she pleaded guilty primarily because she wanted out of jail. For this incident, she was placed on probation for eleven months and twenty-nine days.

Mother's testimony also revealed that Mother had been convicted of felony child abuse and neglect in 2000. Again, Mother alleged that she was "manipulated to plead guilty," after prosecutors asserted that she had beaten a three-month-old baby. Mother's testimony as to how this incident occurred is confusing. From what we can discern, she testified that she was babysitting when the baby was attacked by a puppy.[9] Mother again

---

[9] Mother testified:

> And I took the baby and decided that I was going to clean up on my room. And I took the baby and laid - - I had a daybed. I laid her this way on the bed (indicating). And I had a little puppy that I had with me. And I put it up on the bed, and it scratched its face or the baby scratched its face. I do not exactly know. But I went and told my mother about the baby. She said all right. I told her I was scared for the child. Because the [baby's] mother
>
> (Continued…)

pleaded guilty, but denied responsibility. She ultimately served nine months in jail for this offense.

In addition to her testimony regarding the misdemeanor and felony child abuse charges, Mother testified that she had been charged several times with domestic violence. In 1998, Mother was charged with domestic violence against her sister's boyfriend. Again, in 2003, Mother was charged with domestic violence after Grandmother called police because Mother "got mad and threw [a] plate." In 2004, Mother was charged with domestic violence against Grandmother. In 2011, Mother was charged with domestic violence against her sister at Grandmother's house.

Most recently, on July 3, 2013, Mother and her boyfriend, Marcus B., with whom Mother lives, were both arrested and charged with domestic assault after an incident at their home. Marcus B. told police that the altercation began over an argument concerning Mother's Facebook page. Mother testified that the incident was largely the result of a medication she was prescribed for headaches, which caused her to become angry and combative. Her testimony indicates that she no longer takes this medication. Mother told the police that she locked Marcus B. out of their house, and he kicked in the door. She then locked herself in the bathroom, and Marcus B. kicked in that door as well. Marcus B. then threw Mother on the bed, and she bit him on his thumb and head-butted him. The police arrested both Mother and Marcus B. Ultimately, the court issued an order prohibiting Mother and Marcus B. from having contact until the next court hearing on August 15, 2013. Mother's testimony regarding her compliance with this order is conflicting. First, Mother testified that that she and Marcus B. immediately made up and that she moved back into the house the day following the incident, in direct contravention of the no-contact order. Mother testified that during this time, Marcus B. taught Mother how to shoot an AR-15, a semi-automatic firearm. At another point in her testimony, Mother stated that she moved in with a friend for a time, but then eventually moved back in with Marcus B. Regardless, Mother testified that she contacted Marcus B. at least twice during the period

(…continued)
would call me and ask me if I would babysit the baby because of - - the grandmother was mean to the baby. Excuse my French. Called the baby a "bitch" and a "whore." But she didn't call it once - - that once but she called it that twice. Also my sister Kathy [sic] said that she had caught her saying - - that she said, "Yeah. I watch the little - - and she caught herself calling the baby a bitch again." And - - but the mother would call me and whisper in the phone, "Check the baby when she gets there." And I said, "Tiffany, I don't think that your grandmother is going to do anything to this baby." But at this time I'm like six months pregnant. And Kathy [sic] went out and got the baby. She brought the baby in. Then the next thing you know I'm being questioned . . .

7

in which she was to have no contact with him, explaining that she needed a ride to two separate visitations. Although it is unclear from the testimony, the no-contact order appears to have been dissolved at the August 15, 2013, hearing on the couple's domestic violence charges.

Mother also testified as to the allegation that she failed to support Jamie. Mother testified that although she had sought employment, she was unsuccessful and, therefore, lacked stable employment at the time of trial. Mother's testimony regarding her work history demonstrates sporadic employment history at several jobs. Sometime during June and August 2012, Mother worked as a telemarketer for approximately one week and at a store in the mall for approximately three weeks.

During the pendency of this case, she was employed in several capacities. First, she testified that she received some income from housecleaning. Mother stated that she earns "anywhere between $50 to $100" cleaning houses once or twice a week. In contrast, Marcus B. testified that he was unsure of the precise amount Mother earned from cleaning houses, stating it was "20 to 30 bucks here and there." Although Mother earned income sporadically from housecleaning throughout the relevant four-month period, she testified that she gave the money to Marcus B. because he paid their rent and provided her transportation to court appearances and visitations.

Although she testified that she cleaned houses sometimes twice a week, Mother stated that she only has two regular customers. She said that these customers only request her services once per month. Mother's testimony is unclear as to how many other clients she cleans for during the week. She testified, however, that she cleaned houses less often so she would be able to attend visitation with her children. She also stated that it was difficult to find clients. Mother acknowledged that she was aware of several ways to increase her customer base, such as advertising on Craigslist and putting signs through her neighborhood; however, she never did either of those things. On cross-examination, counsel for Appellees and Mother had the following exchange:

> Q. And you clean at least one house a day or maybe two, couldn't you?
>
> A. Yes.
>
> Q. So you could conceivably make $100 a day cleaning houses, couldn't you?
>
> A. I could have, but I didn't.

The record is unclear as to when she began cleaning houses and the last time she earned money cleaning houses.

In addition to housecleaning, Mother testified that she also earned money by working with her boyfriend, Marcus B., who worked at an auto body shop and also "junked" cars for additional income. Marcus B. said that this money immediately "went right back into the gas tank" because Marcus B. drove Mother to Manchester, Tennessee, so she could attend the proceedings involving the removal of her other children. Marcus B. corroborated Mother's testimony as to his payment for her help and testified that this arrangement continued from about September 2012 until January 2013. Mother was able to help less when her Father's cancer worsened during October 2012. Mother testified that she was actively searching for employment during the relevant time period by applying for jobs in her area. Mother testified that she searched for employment by "walking around my surrounding areas" and turning in applications to various employers, including Burger King, Auto Zone, Dollar General, Save-A-Lot, Papa John's, Kroger, and a dry cleaning store.

Similarly, Mother testified that someone referred her to a manager at a local Waffle House restaurant and said that if she would just go by "La Vergne [Waffle House] and let them know that I did talk to her and could work for her." Mother testified that she had not yet turned in an application. Likewise, Mother testified that she had another job lined up at "A Second Look Consignment" in Smyrna, Tennessee, but her testimony indicates she had not pursued that opportunity yet. Additionally, Mother's records from her mental health provider, Centerstone Community Mental Health Care Center ("Centerstone"), show that Mother said she was "let go a[]lot" because her skills were poor, despite having earned a high school diploma and attending some college.

Mother testified that she has filed for unemployment benefits, but she does not receive any money from unemployment benefits. In contrast, Mother's Centerstone records indicate that Mother declined to apply for disability benefits. At the same appointment where Mother indicated her refusal to apply for disability benefits, the counselor recommended that Mother apply via the internet for a public benefit called Bridges to Care. Despite the fact that Mother appears to have internet access,[10] the record does not indicate that Mother ever applied. Still, Mother receives over $497.00 per month from a resource called Families First for her and three of her children.[11] She testified that

---

[10] Marcus B. indicated to police after his domestic dispute with Mother that the dispute arose over the online social networking site Facebook.

[11] At some point during the trial, DCS returned custody of Austin and Cy to Mother. The two boys had initially been placed in the custody of their paternal grandparents after being removed from Mother's care. After the paternal grandparents decided they could no longer care for the boys, custody was given to the biological father in January 2012. At some point, the biological father and the two boys were living in a pop-up camper without running water or electricity. When DCS received a referral and contacted Mother,

(Continued…)

9

she is currently unemployed, but that she is "pretty busy." She gets her children ready for school in the morning and then stays at home during the day until they are finished with school. During the day, she watches television and cleans the house.

Eventually, after the filing of the termination petition and with the assistance of a DCS worker, Mother obtained employment at Goodwill as a "clothes grader." During training to become a clothes grader, Goodwill paid Mother $7.25 per hour. After Mother's three weeks of training, Goodwill paid her $7.75 per hour. Mother testified that she called the child support office immediately after being hired by Goodwill, and child support was garnished from her check. Mother worked at Goodwill from March 3, 2013 until July 2, 2013. Goodwill ultimately terminated Mother's employment because she was late several times.[12]

Mother testified that she still lacked a driver's license and transportation.[13] Generally, Marcus B. supported Mother and paid their rent and bills. Still, Mother testified that she had obtained stable housing because she and Marcus B. lived in an apartment together, and both signed the lease. Although Mother's testimony was inconsistent at times, her testimony indicates that she lived with Marcus B. beginning in May 2012 and that she may have lived with him even while there was an order prohibiting the couple from contacting each other. Mother contends that she contributed to the couple's $1,175 monthly rent at least once in the amount of $50.00. Mother is unable to obtain government-subsidized housing because of her felony conviction.

---

(…continued)

she told DCS she was unaware of these conditions. In September 2012, the boys entered foster care. DCS developed a permanency plan for Mother to regain custody of the boys. Both boys, but especially Austin, display severe learning and behavioral issues and were in and out of several foster homes. In July 2013, the boys were returned to Mother for a trial home visit. On October 31, 2013, the boys were returned to Mother's custody. Shortly thereafter, Autumn was returned to Mother's custody in January 2014.

[12]We note that Mother also asserted that she had been sexually harassed by a co-worker while working at Goodwill. She testified that a male co-worker followed her into the women's restroom one day and made advances toward her. Mother filed a report against the co-worker, and he was terminated shortly after management at Goodwill discovered that the incident had been recorded via videotape. According to Mother, she was very upset after the incident, and she was moved to work in a different Goodwill building. However, her co-worker's mother worked in Mother's new building, causing further issues. Although this occurred before Mother was eventually terminated for being late too many times, it does not appear from the record that this incident had any impact on Mother's termination.

[13] Mother testified that she does not currently own a vehicle. She does not have a driver's license and has not since approximately 2000. To obtain her license, Mother testified that she has to take the driving test and pay a license reinstatement fee. Mother depends on Marcus B. for transportation.

Turning to Mother's testimony regarding her mental health treatment, Mother contended that she had been compliant with her mental health therapy sessions and medications. Mother suffered from mental health issues for years before her children were removed from her care. Her mental health records indicate that she began treatment at Centerstone on December 3, 1999. Her most recent cycle of treatment at Centerstone began on September 28, 2012, shortly after the juvenile court's order of September 13, 2012 ordering her to address, *inter alia*, her mental health issues. Throughout her treatment there, she has received several diagnoses, including intermittent explosive disorder, major depressive disorder, cannabis dependent episodic, borderline personality disorder, and bipolar disorder. Mother's Centerstone records indicate that these diagnoses resulted in Mother suffering from periods of emotional instability, anger, and violent outbursts. Mother stopped taking certain medications used to treat her mental health while pregnant with Jamie. It is unclear from the record whether Mother's cessation of her medication was ordered by her medical doctor. Still, Mother admitted that she did not resume taking her prescribed medication even after Jamie's birth. Mother asserts however, that since the children were removed from her care on February 20, 2008, she has consistently taken her medication as prescribed and has consistently attended her therapy appointments. She stated that if she was unable to attend an appointment, she promptly rescheduled.

On cross-examination, counsel for Appellees questioned Mother's alleged compliance with her mental health treatment and medications. Centerstone and its counselors keep a record of each scheduled appointment, including notes as to what was achieved at the appointment. Numerous Centerstone records include notes from her counselors stating that Mother "no-showed" for the appointment or canceled at the last minute. On one record, a Centerstone representative noted that, "[Mother] claims unique [circumstances] each time and accepts no responsibility." Mother testified that many of these records were simply incorrect. In all, from September 2012 until December 2012, Mother attended four appointments and canceled or was a no-show for at least seven appointments.

Mother's testimony regarding her compliance with her medication was often confusing. During September 2012 through December 2012, Mother missed four medication management appointments. It was at the medication management appointments that Mother could receive refills on her prescriptions. After the termination petition was filed in January 2013, Mother's attendance at her Centerstone appointments improved. From January 2013 until October 2013, Mother attended twenty-two appointments, and canceled or was a no-show for eleven appointments. Mother maintained at trial that she did not feel as if the medications were working, but testified that she had consistently been taking them. However, prior to October 2012, Mother testified that, prior to October 2012, she had been off her medication for approximately ten months. When Mother testified on July 15, 2013, she said that she had started taking a new medication on

11

April 2, 2013, and that was currently the longest period she had ever been compliant on one medication. In further contradiction of Mother's direct testimony, the record includes as an exhibit a letter dated January 25, 2013, from Ms. Audra Bush, a DCS case manager, to the juvenile court wherein Ms. Bush states that Mother had expressed that she did not need all of the medication prescribed by Centerstone and that Ms. Bush was currently having issues with Mother's compliance at Centerstone.

Ms. Bush also testified at trial. Ms. Bush's testimony focused on Mother's therapy, medication, and attempts to secure housing and employment. Ms. Bush testified that DCS required Mother to obtain a mental health assessment, follow mental health recommendations, be compliant with her medication management, obtain adequate and stable housing, and secure a legal means of income.[14] Ms. Bush stated that Mother and Marcus B.'s home was suitable for an additional child and that she did not doubt Mother's housekeeping abilities. Further, she described Mother's attempts at securing employment as "diligent." She testified that, although Mother missed several of her mental health appointments at Centerstone, "she always rescheduled those appointments." However, on cross-examination, Ms. Bush admitted that any public assistance Mother received was not enough to pay her monthly rent. Still, Ms. Bush insisted that Mother's home was suitable for Jamie's return, even though she was aware of the recent domestic violence incident between Mother and Marcus B. She stated that she believed that Mother was compliant with any anger management requirements set forth by DCS, but she admitted she actually did not know whether Mother attended anger management and that she has not received any Centerstone records indicating that she had.

At trial, Appellees, with whom Jamie currently resides, also testified. Appellees described their time spent with Jamie, how they have bonded with him, and his development while in their care. Kathryn C. first met Jamie when she worked doing in-home developmental therapy for First Steps, Inc. ("First Steps"). The therapy typically included one hour sessions of exercises to address Jamie's delays in motor skills and cognitive development. Kathryn C. provided services at Grandmother's home to Jamie beginning in May 2008 when he was six months old. She provided these services until November 2010.

Regarding the in-home therapy sessions, Kathryn C. testified that she primarily worked with Grandmother, and Mother was usually asleep when the sessions began. Kathryn C. was required to keep notes of all visits in Grandmother's home, and she indicated in her notes that Mother sometimes participated in the sessions. At trial, however, Kathryn C. testified that Mother "was typically asleep on the couch or out of the room or .

---

[14]These requirements appear to be connected to a permanency plan entered in connection to DCS's removal of Austin and Cy, not Jamie.

. . playing on her phone in the kitchen. But my contact was primarily done with [Grandmother]."[15] Kathryn C. indicated that Mother occasionally showed interest in Jamie's therapy, but "[i]t kind of seemed to depend on when she had to go to court." Additionally, Kathryn C. testified that Mother would often yell at others in the home to "shut up . . . because she was trying to sleep." Kathryn C. also indicated that she was concerned regarding the constant smoking in the home because of Jamie's heart condition. She also testified that Mother often would say "That's not my responsibility," when requested to get the children ready or to change Jamie's diaper.

Jamie began to live with Appellees immediately after Grandmother passed away. Steven C., Kathryn C.'s husband, testified that Appellees' extended family supported the decision, and Jamie's developmental issues had improved since the child had come to live with them. Steven C. testified that he, Kathryn C., and Jamie shared a close bond.

Appellees and their witnesses generally testified that Mother's outbursts often disrupted visitation while Jamie remained in Appellee's custody. At one visitation at a local McDonald's restaurant, Mother became violent with her elderly father who was also attending the visitation. Her father had recently been diagnosed with Stage IV cancer. Mother cursed at him, screamed, and shoved him. According to Appellees, Jamie was in close proximity. Mother also became combative with her sister, Catherine P., at a visitation when Catherine brought her own children to the visitation. Mother believed Catherine's children would take away from her visitation with Jamie. According to Appellees, Mother began arguing with her sister, which brought the visitation to an end. These disruptions often resulted in upsetting Jamie, and he would begin screaming, crying, and banging his head against things.

Appellees indicated that Mother had a difficult time understanding Jamie during phone visitation and became impatient with him as he was talking. Appellees testified that they did not believe that Mother understood what appropriate phone behavior for Jamie was, given his age and special needs. Appellees and their witnesses also testified that Mother paid no support or made any provisions of in-kind support for the child prior to the filing of the termination petition; instead, they testified that they only received child support payments from Mother when it was garnished from her wages earned at Goodwill, beginning after the filing of the termination petition.

Appellees also introduced the child's school records, which showed that he was progressing academically. Appellees testified that they have taken the child for evaluations at Vanderbilt University Medical Center, including speech development and occupational

---

[15]Kathryn C. testified that the focus of her notes was not to judge the engagement of the parent or child's caregiver at therapy, but rather to note the child's progress. For this reason, she testified that her notes often did not include that Mother failed to engage with Jamie's therapy.

therapy evaluations. According to Appellees, they are involved at the school where Jamie attends kindergarten and plan on enrolling him in a summer camp with other children.

Testimony from Jamie's pediatrician also showed that he has received appropriate and regular medical attention while in Appellees' care. Jamie's pediatrician, Dr. Dana Haselton, testified that the child's genetic conditions cause a variety of issues, including heart issues and delays in speech and hearing development. Eventually, the child will need surgery to correct some of the issues associated with these disorders. Dr. Haselton testified that a review of the child's medical records shows that he had not been seen regularly by a doctor prior to living with the Appellees. Dr. Haselton testified that, since she began seeing Jamie, she has noticed significant improvements in Jamie's ability to maintain eye contact, communicate, and engage with people. According to Dr. Haselton, Mother has never attended a single appointment with the child, nor has she made any effort to contact Dr. Haselton's office in any way about the child's medical conditions. When questioned about the child's health, however, Mother was able to generally testify about the child's current condition and the challenges that might result from his disorders.

After the conclusion of the trial, on June 6, 2014, the juvenile court entered a written order regarding the termination of Mother's parental rights. The juvenile court concluded that clear and convincing evidence existed as to two grounds for termination: (1) abandonment by willful failure to support; and (2) persistence of conditions. [16] Additionally, the juvenile court concluded that clear and convincing evidence existed to support termination of Mother's parental rights on the ground of abandonment by willful failure to visit, but declined to conclude that it was terminating Mother's rights on this ground because it found other grounds existed. The juvenile court also found that it was in the best interest of Jamie for Mother's rights to be terminated. From this order, Mother now appeals.

### Issues

As we perceive it, Mother presents four issues:

> 1. Whether the juvenile court erred in finding that clear and convincing evidence existed to prove that Mother willfully abandoned the child by failing to pay support;
>
> 2. Whether the juvenile court erred in finding that clear and convincing evidence existed to prove the ground of persistence of conditions; and

---

[16]The trial court declined to find that clear and convincing evidence supported the ground of incompetence. Neither party raised this ground as an issue on appeal. Accordingly, we do not address it in this Opinion.

3. Whether the juvenile court erred in finding that clear and convincing evidence existed to prove that termination of Mother's parental rights was in the best interest of the child.

Appellees raise an additional issue for appeal:

1. Whether the juvenile court erred in finding that clear and convincing evidence existed to prove that Mother willfully abandoned the child by failing to visit.

## Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the juvenile court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise.

15

Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the juvenile court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

## Grounds for Termination

In their petition to terminate Mother's parental rights to Jamie, Appellees alleged three related, but distinct, grounds for termination of Mother's parental rights: abandonment by willful failure to visit, abandonment by willful failure to support,[17] and the persistence of conditions. We address each in turn.

### *Abandonment Generally*

Appellees first alleged abandonment by willful failure to visit and abandonment by willful failure to support pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) and Tennessee Code Annotated Section 36-1-102(1)(A)(i) respectively. In pertinent part, Tennessee Code Annotated Section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . . .

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part as follows:

---

[17] The parental duty of support is separate and distinct from the parental duty of visitation. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the a [sic] parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i).

The statutory definition of "abandonment" requires us to focus on the "period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights[.]" Tenn. Code Ann. § 36-1-102(1)(A)(i). In the present case, the four-month period for purposes of establishing abandonment by failure to visit and support is September 27, 2012, until January 27, 2013, the day before the petition was filed.

In order for a court to terminate a parent's parental rights on the ground of abandonment, that abandonment must be willful. In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months . . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free

17

agent, knows what he or she is doing, and intends to do what he or she is doing . . . .

* * *

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. ***In re M.J.B.***, 140 S.W.3d at 654; *see also **Shorter v. Reeves***, 72 Ark.App. 71, 32 S.W.3d 758, 760 (2000); ***In re B.S.R.***, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); ***In re Estate of Teaschenko***, 393 Pa.Super. 355, 574 A.2d 649, 652 (1990); ***In re Adoption of C.C.T.***, 640 P.2d 73, 76 (Wyo. 1982). . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

***In re Audrey S.***, 182 S.W.3d at 863–64 (internal citations and footnotes omitted).

In determining whether a parent's conduct was willful, it may become necessary in a given case to evaluate events occurring prior to the start of the four-month period. Thus, events occurring prior to the four-month period may bear on the willfulness of the parent's conduct during the four-month period. *See **In re Alex B.T.***, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *6 (Tenn. Ct. App. Nov. 15, 2011) ("Courts often consider events that occurred prior to the relevant period to determine if there was interference with the biological parent's attempts to visit or support the child[.]"); *see also **In re Keri C.***, No. E2010-00381-COA-R3-PT, 2010 WL 4739706, at *16 (Tenn. Ct. App. Nov. 22, 2010) (explaining that the parent's conduct prior to the four-month period is "relevant background and context for the necessarily fact-intensive evaluation" of the parent's conduct during the four-month period).

"Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." ***In re Adoption of Angela E.***, 402 S.W.3d at 640 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d at 810). As previously discussed, this Court reviews questions of law *de novo* with no presumption of correctness. ***Id.***

*Abandonment by Willful Failure to Support*

We begin with the termination of Mother's rights based on the juvenile court's conclusion that Mother abandoned Jamie by her willful failure to support him during the relevant four months preceding the termination petition. For purposes of this subdivision of abandonment, "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the "willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as support that "under the circumstances of the individual case, is insignificant given the parent's means." *Id.* at (1)(B).

In this case, there is no question that Mother provided no support for the child during the relevant four-month period. Instead, the only question on appeal involves whether that failure was willful. In the context of support, a parent's "[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support." *In re Jarett M.*, No. W2014-01995-COA-R3-PT, 2015 WL 1647924, at *5 (Tenn. Ct. App. Apr. 13, 2015) (citing *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005)).

Here, the juvenile court made the following specific findings concerning the ground of abandonment by willful failure to support in its June 6, 2014 order:

> 29. [Mother] was ordered to pay child support to [Appellees] pursuant to an Order Setting Support entered by this Court on March 15, 2012[.] She was ordered to pay $285.00 per month in current support and $43.33 [per month] in retroactive support for a monthly total of $328.33. [Mother] has willfully failed to pay child support as ordered. In the four months prior to the filing of the Petition in this matter, [Mother] did not pay child support. [The record] shows seven payments totaling $989.55, for the period March 26, 2013 through June 17, 2013 . . . and two payments totaling $168.11, for the period July 1, 2013 through July 15, 2013.
>
> 30. [Mother] is abled bodied and capable of working. [Mother] submitted no proof that she was disabled or incapable of working. This was true from September 28, 2012 through January 28, 2013. During this time, she did not have children to care for and she in fact worked during this period of time. Both [Mother] and her boyfriend, Marcus B[.], testified that

she frequently worked for him and he paid her for this work. She also worked cleaning houses during this time period. During her testimony, she even mentioned the name of at least one, if not more, of her customers.

Based on the above findings, the juvenile court concluded that clear and convincing evidence existed to terminate Mother's parental rights on the ground of abandonment by willful failure to support. Mother appeals this determination and argues that her failure to pay such support was not willful because she did not have the ability to pay.

Mother was clearly aware of her duty to provide support to Jamie as set forth in the March 15, 2012 child support order in the amount of $328.33 monthly. Despite Mother's acknowledgement of her support obligation, Mother testified that she did not pay child support in the relevant four month period. Mother contends that her failure was not willful due to her limited income, stemming from her unemployment, and the cost of her monthly expenses.

A thorough review of the record leads this Court, like the trial court, to conclude that Mother's failure to support the child was willful. First, the record indicates that Mother did earn some sporadic income during the relevant four-month period, both by cleaning houses and helping her boyfriend with his employment. Mother testified, however, that all of this income was required to pay the couple's expenses. The record does indicate that Mother typically turned over any income to Marcus B. for household bills, transportation, and gas.

Other than these sporadic jobs that offered little in the way of support, however, Mother had no stable employment that would allow her to support the child. Simply because Mother was unemployed or underemployed and not disabled does not necessarily mean that her lack of paying child support was willful. *In re M.P.J.*, No. E2008-00174-COA-R3-PT, 2008 WL 3982912, at *10 (Tenn. Ct. App. 2008) (discussed in detail, *infra*). Instead, the inquiry becomes whether the parent's unemployment or underemployment is willful. *Id.* Upon review of the record in this case, it appears that Mother, despite some effort on her behalf, has remained unemployed because of her intentional failure to follow through with several opportunities to become employed. Although Mother's testimony reveals numerous places of employment where Mother has applied for a job, Mother's testimony also reveals that she has turned down or failed to pursue multiple employment opportunities that would produce income. *See In re M.P.J.*, 2008 WL 3982912, at *10 ("In light of Father's testimony that he was offered employment and he declined that employment, we conclude that his unemployment was voluntary."). Mother's testimony generally indicates apathy toward the concept of finding suitable employment in an effort to support her children. For example, Mother indicated that she had lined up employment opportunities at Waffle House and a local consignment store.

Instead of pursuing these opportunities, Mother testified that she often stayed at home and watched television or cleaned during the day. In addition, Mother testified that she could have advertised her cleaning services to increase her customer base, allowing her to make up to $100.00 per day, but that she simply declined to make the effort. Mother's failure to pursue these opportunities does not appear to have been due to any external issues beyond her own control. Instead, Mother's failure to earn sufficient income to support her son appears to simply have been the product of her own refusal to make an effort to do so. For example, Mother's counselor at Centerstone noted that Mother expressed animosity toward all authority figures mentioned, including bosses, and that Mother simply did not want to do some of the jobs she might be qualified for, such as working at a fast food restaurant. Moreover, from the record, it appears that Mother lost the jobs that she did have due to her own failure to comply with the rules of her employment. Under these circumstances, we must conclude that Mother's inability to support her child is a product of her own making.

We note that some recent Tennessee cases have come to different conclusions regarding whether a parent's failure to support his or her child is willful. These cases, however, are easily distinguishable from the case-at-bar. First, in ***In re Adoption of Angela E.***, 402 S.W.3d 636 (Tenn. 2013) the child's mother and stepfather sought to terminate the parental rights of the child's biological father for his alleged willful failure to support. ***Id.*** at 640. The child's biological father, a medical doctor, earned income of approximately $150,000.00 annually. The biological father undisputedly provided support in the amount of $3,500.00 during the relevant four-month period. Under a previous court order, however, the biological father was ordered to pay $10,000.00 during this period. ***Id.*** The child's mother argued that biological father's payment was meager given his means, and that, therefore, his support payment should be deemed token. ***Id.*** (citing Tenn. Code Ann. § 36-1-102(1)(B)). On appeal, the Tennessee Supreme Court first considered the evidence in the record regarding the biological father's income and expenses, which evidence it deemed "limited at best." ***Id.*** The Court determined that it could not evaluate the biological father's capacity to pay more support than he had paid because of the sparse evidence. ***Id.*** at 641. Ultimately, the Court agreed with the trial court's conclusion that "Father's payment of $3500 during the four months immediately preceding the petition for termination precluded a finding of abandonment." ***Id.***

Another recent case, ***In re Noah B.B***, held that clear and convincing evidence did not exist as to a mother's willful failure to support when the petitioners failed to show the mother's financial means, expenses, or obligations during the relevant four-month period. ***In re Noah B.B.***, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, *9 (Tenn. Ct. App. Mar. 12, 2015). Unlike the father in ***Angela E.***, however, the mother in ***Noah B.B.*** was unemployed and had not paid any support to the child during the relevant four-month period. Like in ***Angela***, the evidence regarding her capacity to pay support was meager.

*See id.* at *8. Mother testified that she graduated from high school, had "a little bit of college" education, and was physically healthy. *Id.* At the time of trial, she stated she was unemployed but searching for a job. *Id.* Noting the insufficiency of evidence concerning the mother's capacity to pay, the court opined that "[i]t is not enough for a petitioner to 'simply prove that [m]other was not disabled during the relevant timeframe' and therefore assume that she was capable of working and paying child support." *Id.* at *9 (citing *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *18 (Tenn. Ct. App. Apr. 17, 2014)). Because there was also a suggestion that mother's unemployment[18] was due to a prior back injury and her testimony that her criminal record prevented her from obtaining employment, there was some question as to whether mother may have had a justifiable excuse for the unemployment. Under these circumstances, the Court of Appeals concluded that there was simply insufficient evidence in the record to meet the high clear and convincing burden. *Id.* at *9.

The cases of *Angela E.* and *Noah B.B.* indicate that a court can only determine willfulness of a parent's failure to support where there is sufficient evidence regarding the parent's ability to pay. The facts presented in *Angela E.* and *Noah B.B.* are simply not analogous to this case. First, unlike in *Angela E.* where the biological father actually did make some payments to support the child during the relevant four-month period, Mother has not paid anything during the relevant time frame in this case.[19] Thus, in *Angela E.*, the issue was not whether biological father had some capacity to pay support and instead voluntarily chose not to make an effort to meet his support obligation, but instead involved whether biological father could have paid more, given his means. Biological father's expenses were, therefore, highly relevant to that determination. The facts in *Noah B.B.* are somewhat closer to the facts here, but involve evidence that was simply not presented in this case: that mother's inability to obtain employment may have been the result of issues outside her control. Thus, neither *Angela E.* nor *Noah B.B.* require this Court to hold that Mother's failure to pay support in this case was not willful.

Furthermore, we do not interpret either *Angela E.* or *Noah B.B.* as holding that there cannot be a finding of willful failure to support a child even where the evidence supports a finding of willful unemployment. Indeed, other cases have held the opposite. For example, in *In re M.P.J.*, No. E2008-000174-COA-R3-PT, 2008 WL 3982912 (Tenn.

---

[18] The Court of Appeals noted that there was not even sufficient evidence in the record to actually determine whether the mother was actually unemployed during the relevant period. *Id.* at *9.

[19] In addition, we are cognizant of the evidence demonstrating that Mother paid child support after the filing of the petition when it was garnished from her Goodwill wages. However, Tennessee Code Annotated Section 36-1-102(1)(F) provides that "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]"

Ct. App. Aug. 27, 2008), the mother sought to terminate biological father's parental rights for, *inter alia*, abandonment by failure to support. It was undisputed that the biological father was unemployed during the relevant four-month period. The Court of Appeals, however, stated that the dispositive issue was not whether biological father was unemployed, but whether the unemployment was willful. Because the evidence showed that the biological father was offered employment, but declined to accept that employment, the Court of Appeals held that his unemployment was voluntary. *Id.* at *10. The Court of Appeals concluded that because biological father's inability to pay resulted from his voluntary unemployment, his failure to pay was willful for purposes of Tennessee Code Annotated Section 36-1-102. *Id.* ("Had he accepted the employment offer, he would have had an income and could have made at least some support payments.").

From the record as a whole, we conclude that Mother has abandoned Jamie based on her willful failure to support him. The juvenile court's ruling on this ground is affirmed. Although only one ground for termination of parental rights must be met, the Tennessee Supreme Court has directed this Court to review the findings of fact and conclusions of law as to each of the juvenile court's grounds for termination in order to avoid unnecessary remand. *See In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we continue on to consider whether the ground of abandonment by willful failure to visit was also established in this case.

### *Abandonment by Willful Failure to Visit*

Another way to prove abandonment is by establishing "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Again, there is no dispute in this case that Mother had no visitation with the child during the relevant four-month period. Mother argues, however, that her failure to visit with the child was not willful because she was prevented from visiting the child by an order of the juvenile magistrate and that she was actively pursuing legal action to overturn that order during the four-month period. From the record, we agree.

As previously discussed, prior to the filing of the termination petition, the juvenile magistrate suspended Mother's visitation pending further orders of the court. In its September 13, 2012 order, the magistrate said:

> The Court is not terminating Mother's visitation but leaving it
> in Mother's control based on the fact that continued visitation
> will only occur once Mother is able to demonstrate compliance
> with the directives in the Court's Order of September 2, 2011,
> wherein Mother was advised that "she needs to obtain stable

housing, transportation, employment, alcohol and drug sobriety, and mental health stability."

The magistrate required Mother to complete a mental health assessment and stated that, once Mother completed the above requirements, she could present herself to the court for further modification of visitation. Mother appealed the magistrate's order to the juvenile court judge. During the pendency of the appeal of this order to the juvenile judge, Mother completed a mental health assessment and received treatment. Ultimately, by written order entered February 20, 2013, the juvenile court judge reinstated visitation, listing a certain time and place for Mother to have visitation with Jamie on two separate occasions.

Ultimately, in terminating Mother's parental rights, the juvenile court found that Mother's non-compliance with the court order of September 2, 2011, (i.e. the order denying Mother custody of all four children) was what caused the suspension of her visitation. Specifically, the court stated that Mother was put "on notice through [the court's] numerous orders requiring her to address the issues which resulted in the initial removal of her children." Because Mother waited over a year from the September 2, 2011, order to make any effort to address these issues (e.g., receiving a mental health assessment) and only did so after the magistrate specifically suspended her visitation, the juvenile court found that Mother caused the suspension of visitation. Accordingly, the juvenile court found Mother's failure to visit was willful.

Still, despite its detailed findings indicating that Mother's failure to visit was willful, the juvenile court's written order states: "[F]inding other grounds for termination of parental rights, the Court will not enter a finding regarding abandonment for willful failure to visit." We note that trial courts should address all of the alleged grounds for termination to prevent delay in rendering a final decision. ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. Ct. App. 2003). While we realize the juvenile court made detailed findings of fact regarding this ground, it is unclear to this Court why the juvenile court determined that the existence of other grounds for termination would prohibit the court from finding the existence of another ground inappropriate. Our Supreme Court has stated:

> The trial court is required to find only one statutory ground for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113 (2001). However, given the importance of establishing the permanent placement of a child who is the subject of a termination of parental rights proceeding, the trial court should include in its final order findings of fact and conclusions of law with regard to each ground presented. If the trial court addresses each ground that is raised in a termination

24

> proceeding, the child's permanent placement will not be
> unnecessarily delayed due to a remand for findings on alternate
> grounds.

*Id.*

The discrepancy in the juvenile court's order does not change our standard of review. Additionally, we still consider whether the facts, either as found by the trial court or supported by a preponderance of the evidence, clearly and convincingly establish the ground of abandonment by willful failure to visit. Tenn. R. App. P. 13(d); ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). Accordingly, we turn to the Mother's contention that because of the suspension of her visitation in the September 2, 2011 order, and her appeal of that order, Mother's failure to visit was not willful.

In its ruling as to this ground, the juvenile court does not discuss the testimony of Mother, but appears to base its decision solely on the fact that its order stated that visitation could be modified based on Mother's compliance with certain conditions. The juvenile court's order makes no reference to Mother's appeal of the suspension of her visitation to the juvenile court judge. Nor does the court discuss whether Mother prosecuted her appeal within the relevant four-month time period. While the juvenile court does render some findings of fact as to this ground, intent should be determined by the sum of a party's actions and conduct. *In re Audrey S.*, 182 S.W.3d at 864. Here, it is clear that Mother made efforts to appeal and argue the suspension of her visitation. Additionally, shortly after the September 13, 2012 order suspending her visitation, she obtained a mental health assessment and began treatment presumably in an effort to regain visitation.

The Tennessee Supreme Court considered a similar issue in ***In re Adoption of A.M.H.***, 215 S.W.3d 793 (Tenn. 2007), which involved a termination of rights petition filed by the guardians of the child against the child's biological parents on the ground of abandonment by willful failure to visit. *Id.* at 796. The biological parents of the child undisputedly exercised no visitation with the child in the relevant four-month period. *Id.* at 801–02. However, immediately prior to the four-month period, custodial parents refused to permit the biological parents to take the child from the guardians' home for family pictures and the police were called to escort the biological parents off the guardians' property. *Id.* at 801. Less than a month later, the biological parents sought judicial intervention to regain physical and legal custody of their child. A few months later, the biological parents filed a petition to regain custody of the child, and parents were actively litigating that case when the guardians filed their termination petition. *Id.* at 802. The Tennessee Supreme Court concluded that these facts failed to establish willful failure to visit, stating:

25

Here, we are presented with a situation in which the parents of [the child] actively pursued legal proceedings to regain custody of [the child] during the "abandonment" period but failed to visit for a period of four consecutive months immediately prior to the filing of a petition for termination of parental rights. . . .We hold that the evidence in this case does not support a finding that the parents intentionally abandoned the [child].

*Id.* at 810. The Court further explained its holding, opining:

Th[e] undisputed evidence does not support a finding that the [biological] parents' failure to visit [the child] was willful. Where, as here, the [biological] parents' visits with their child have resulted in enmity between the parties and where the [biological] parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a "willful failure to visit" as a ground for abandonment. Therefore, we hold that there has been no willful abandonment and reverse the termination of parental rights.

*Id.* at 810–11 (footnote omitted). Thus, the Tennessee Supreme Court held that even where a parent has not visited a child in the relevant four-month period, that fact alone is insufficient to support a finding of willful failure to visit where visitation has been thwarted by the other party and the parent is actively pursuing legal proceedings to regain custody or visitation with the child.

From our review of the record, the facts in this case are somewhat analogous to *In re Adoption of A.M.H.* because Mother was pursuing visitation with Jamie by appealing the order suspending visitation and attempting to comply with the juvenile magistrate's requirements during the relevant period. Although the record in this case does not provide her legal basis for pursuing the appeal of the magistrate's September 13, 2012, suspension of her visitation, the record does indicate that she did appeal that order. Furthermore, the juvenile judge did indeed enter an order overturning the magistrate's ruling and providing that Mother was entitled to visitation. It is unclear from the record as to whether the juvenile judge reinstated Mother's visitation because it concluded that the juvenile court erroneously suspended Mother's visitation or whether it found that Mother had complied with the magistrate's requirements. Regardless, Mother successfully obtained reinstatement of her visitation, and there is no dispute that she resumed visiting with the child once she was permitted to do so.

26

Pursuant to Tennessee Code Annotated Section 37-1-107, Mother was required to file her appeal within five days to prevent the order suspending her visitation from becoming a final order. Thus, it appears that Mother's appeal was pending during the entire relevant four month period. It also appears that Mother followed through with her appeal as it was heard by the juvenile judge on January 29, 2013, one day after the filing of the termination petition. Thus, we can infer that, at some point during the four months preceding the termination petition, Mother set her appeal of the juvenile magistrate's order for a hearing. Accordingly, during the four-month period before the petition was filed, albeit after numerous chances to correct certain lifestyle and mental health issues or risk losing visitation, Mother was actively pursuing visitation with Jamie.

We also note that Mother regularly attended visitation with Jamie before the relevant four-month period, and this regular visitation allowed Jamie to maintain some sort of relationship with Mother. Thus, Mother's previous efforts to visit with Jamie support our conclusion that Mother did not willfully fail to visit the child. *See generally **In re Mark A.L.**,* 2013 WL 5536801.

Because Mother was clearly making an effort to reestablish visitation with Jamie during the relevant four-month period, we must conclude that the Appellees failed to establish by clear and convincing evidence that Mother willfully failed to visit with the child pursuant to Tennessee Code Annotated Section 36-1-102.

### *Persistence of Conditions*

We next consider the issue raised by Mother regarding the juvenile court's finding of persistence of conditions. Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at \*6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008)).

In concluding that the ground of persistence of conditions was proved by clear and convincing evidence, the juvenile court stated:

> [Mother] has failed to support Jamie G[.]; failed to exercise regular visitation; failed to maintain a stable source of income, housing, or transportation; and failed to comply with the directives of the Centerstone personnel including directives in regards to prescription medications for her previously diagnosed mental health disorders.

It is undisputed that the child in this case was removed from Mother's home by order of the Davidson County Juvenile Court more than six months prior to the initiation of the termination proceedings. However, Mother argues that the record lacks sufficient evidence to support the juvenile court's conclusion that the conditions that led to the child's removal, specifically Mother's untreated mental conditions and her lack of support, still persist and would, in all reasonable probability, subject the child to further abuse or neglect. Upon a thorough review of the record, we respectfully disagree with Mother's argument.

Mother's mental health and her treatment thereof were at issue in juvenile court proceedings involving Mother as far back as January 2008. While Mother disputes that her mental conditions make her unfit to parent, the juvenile court made specific credibility findings as to Mother's testimony concerning her mental health treatment. As it relates to Mother's medication management, the trial court found:

> Although [Mother] continues to insist that she is compliant with the medication necessary to address her serious mental health diagnoses, her testimony is again not credible and is in contradiction to the Centerstone Mental Health records.

In addition to the specific findings of credibility, the trial court also noted generally that it simply did not consider Mother to be a credible witness. Findings of fact based on witness credibility are given great deference on appeal. It is well-settled that when the resolution of issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The trial court's findings on credibility, whether express or implicit, are entitled to great deference on appeal. *See Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008). Here, the juvenile court's finding of the persistence of conditions was clearly based upon its credibility finding that Mother had not made as much progress as she indicated in her testimony. Accordingly, where the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Franklin Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)).

It is undisputed that Mother suffers from a variety of mental health issues, including intermittent explosive disorder, major depressive disorder, cannabis dependent episodic, borderline personality disorder, and bipolar disorder. Because of these mental health issues, the juvenile court repeatedly ordered Mother to endeavor to remedy these problems, including by attending Centerstone counseling and diligently taking her prescribed medication. Relying in large part on Mother's Centerstone records, the trial court concluded that Mother had not succeeded in remedying her problems and that it was unlikely that she would do so in the future. Accordingly, we will first consider those records.

According to Mother's Centerstone records, Mother's mental health issues resulted in poor impulse control, irritability, frustration, lack of anger management skills, and lack

of coping skills. Her records further indicate that Mother exhibited "[e]xtremely poor" judgment. Mother's records reflect that she was often unwilling to take responsibility for missed appointments or for her prior convictions for child abuse. The records also indicate that Mother was not properly attending scheduled appointments at Centerstone. For example, during the approximately four-month period prior to the filing of the termination petition, Mother missed more appointments than she attended at Centerstone and was not making progress in addressing her mental health concerns. Furthermore, because Mother's missed appointments often involved medication management, it is clear that Mother could not be fully compliant with her prescribed medication because she did not attend appointments wherein she was to obtain refills on her prescriptions. Nothing in the records indicates that Mother had made any progress in addressing the mental health issues that kept her from parenting the child.

Despite the detailed Centerstone records indicating that Mother often cancelled or no-showed for her appointments, Mother asserted that these records were incorrect. Mother, however, offered no credible evidence to support a finding that these records were erroneous or altered to place Mother in an unfavorable light. Additionally, on appeal, Mother offers no clear and convincing evidence to set aside the trial court's credibility finding. Accordingly, we agree that Mother was simply not credible on this issue.

Mother asserts, however, that her compliance is supported by other evidence in the record, including the testimony of Ms. Bush, the DCS worker. Ms. Bush's testimony likewise contradicted the other evidence in the record, and at times, her own prior statements. For example, Ms. Bush admitted that she filed a letter with the trial court just days before Appellees' termination petition was filed.[20] In this letter, Ms. Bush detailed Mother's refusal to follow Centerstone's directives and the fact that her mental health issues remained largely unchecked. This letter, coupled with the Centerstone records and the other testimony at trial, clearly and convincingly demonstrate that Mother was not compliant with the juvenile court's order to address her mental health issues. After considering all of the testimony and the Centerstone records, the trial court's ruling demonstrates that it gave more weight to the detailed and lengthy records from Centerstone than to Mother and Ms. Bush's contradictory testimony. Based on the evidence in the record and the trial court's credibility finding, we agree that the evidence in the record supports the juvenile court's factual findings regarding Mother's compliance with her mental health directives.

From our review of the Centerstone records and the testimony at trial, it is clear that Mother's mental issues have not been remedied and, therefore, "prevent the child's safe

---

[20] The letter does not indicate to whom it was directed. It appears that the letter merely served to memorialize Ms. Bush's observations in the trial court's file.

return to the care of" Mother. Tenn. Code Ann. § 36-1-113(g)(3). Here, testimony shows that Mother has had violent outbursts, directed at Grandmother, Grandfather, and Marcus B. Mother's recent inappropriate behavior at visitation has caused the child considerable distress. Even more distressing, Mother has pleaded guilty or been convicted of three separate charges of child abuse and has been arrested for domestic violence on several occasions. Rather than treating the mental illnesses that led to these violent episodes, Mother failed to diligently follow Centerstone's requirements, often missing appointments and failing to attend appointments dealing with her medication management. Mother's conditions, which often lead her to become easily aggravated, frustrated, and violent, simply make her unable to parent Jamie, a special needs child.

Additionally, it appears that Mother simply refuses to take responsibility for her own actions. While Mother's refusal to admit that she has failed to properly attend Centerstone Counseling, as the records clearly show, is somewhat troubling to this Court, we are far more concerned with Mother's refusal to take responsibility for the multiple times that she had been charged with abuse of a child. In every case, Mother testified that these charges were false, but in every case, Mother either pleaded guilty or was found to have committed a crime against a child. This Court has previously considered a parent's refusal to take responsibility for his or her anger management issues in concluding that the ground of persistent conditions had been established. *See* **S**tate Dept. of Children's Servs. v. D.A.B.*, No. E2006-01490-COA-R3-PT, 2006 WL 3694449, at *15 (Tenn. Ct. App. Dec. 15, 2006) (considering father's refusal to accept responsibility for his anger management problem as evidence that the conditions that led to the child's removal persisted). Here, Mother not only refuses to take responsibility for her anger management issues, but she refuses to take responsibility for her prior convictions for child abuse.

The evidence also shows that Mother remains unemployed, lacks a stable source of income, remains without a driver's license or transportation, and lacks a safe and stable home environment.[21] Essentially, Mother has refused or been unable to make any meaningful change in her circumstances. For example, regarding her inability to maintain employment, Mother's Centerstone records from November 12, 2012 indicate that Mother expressed animosity toward all authority figures mentioned, including her bosses, and that Mother "does not want to do many [of the jobs] she might be qualified for (eg. Mother

---

[21] The witness from DCS, Ms. Bush, testified that Mother did not have stable housing before moving in with Marcus B. However, at trial, Ms. Bush testified that Mother did have stable housing at the time of trial, despite the fact that Mother did not earn enough income to cover her own rent and the fact that both Mother and Marcus B. had been recently arrested for domestic violence. It appears that the trial court did not find that Ms. Bush's conclusion that Mother had suitable housing was credible. The juvenile court found, and we agree, that "but for Marcus B[.], [Mother] would more likely than not be without housing[.]" The precariousness of Mother's situation is exacerbated by the fact that Mother and Marcus B. were involved in a recent domestic violence incident, which certainly indicates that their relationship is less-than-stable.

stated that she "[didn't] want to do fast food or I'll get fat and be diabetic.") Mother testified several times that she would rather be a stay-at-home mother than be employed. Mother's testimony indicates that, while she has submitted several employment applications, she has no sincere interest in financially supporting her children. Essentially, even after numerous opportunities, Mother has not regained control of her circumstances. She is still financially unstable, making her unable to financially support Jamie and provide him with a stable environment. Mother is essentially in the same position she was when Jamie was removed from her care initially.

Last, the continuation of the parent-child relationship between Mother and Jamie would greatly diminish Jamie's chance to integrate into a permanent home with Appellees, as evidenced by the negative effects produced at visitation with Mother. As detailed in the testimony, Jamie often becomes emotionally upset and disturbed because of Mother's behavior at visitation. A continuation of this confusing and problematic parent-child relationship would disrupt Jamie's integration into a new, stable home. Based on the foregoing, we conclude that the juvenile court did not err when it found that the ground of persistence of conditions was proved by clear and convincing evidence.

### Best Interest of the Child

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. ***In re Audrey S.***, 182 S.W.3d at 877. The focus shifts to the child's best interest. ***Id***. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. ***Id***. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." ***Moody***, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

33

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Based upon the foregoing discussion, it is clear that Mother has struggled to make an adjustment of circumstances, conduct, or conditions so as to make it safe and in Jamie's best interest to be in her care. Despite DCS's efforts and efforts of various support agencies, Mother has failed to make a lasting adjustment, as evidenced by the fact that she remains unemployed and without a driver's license or transportation. More importantly, it is unclear whether her current mental state would promote Jamie's well-being if returned to her, as evidenced by Mother's most recent arrest for domestic violence against Marcus B. Despite efforts to find employment, Mother has failed to support Jamie. Further, she has failed to maintain an active role in the developmental and medical aspects of Jamie's life.

The record indicates that Jamie has done well in Appellees' care. Kathryn C. testified that Jamie entered her home on May 31, 2011. She testified that she has witnessed Mother's failure to understand Jamie's developmental struggles and has witnessed Mother become frustrated with him. She also testified that Mother's outbursts often caused visitations to go awry, which resulted in Jamie becoming angry, screaming, and banging his head. Kathryn C. also testified that Jamie has bonded extremely well with her family, including her husband Steven C. She stated that Jamie has adapted well since the birth of Appellees' biological child, and the two children behave like brothers.

Regarding Jamie's well-being in Appellees' care, both Appellees' testified that Jamie is progressing academically, medically, and developmentally. Kathryn C. testified that the child's medical condition will require routine monitoring and extensive medical treatment in the future. Appellees have ensured that the child receives appropriate medical care; in contrast, testimony shows that Mother often declined to participate in the child's therapy and has failed to make any effort with regard to the child's physical health, either before or after the Appellees began caring for the child. Jamie's school records also indicate that Appellees are involved with his education and that he is succeeding in school as well.

Finally, from the totality of the circumstances, it appears that a change in caretaker and a change in physical environment would likely have a negative effect on Jamie at this

stage. While living with Appellees, Jamie has received regular medical care and has enjoyed stability, both of which have resulted in an improvement in his behavior and other areas of cognitive development. To remove him at this point and place him in what is still an unstable environment with Mother would likely undo these positive changes.

Applying the foregoing statutory factors, and for the stated reasons, it is clear that Mother has not made a lasting change in her conduct or condition that would allow Jamie to return to her care at an early date. She has not supported Jamie financially and still remains unemployed. She has recently been arrested for domestic violence. While this Court does not doubt Mother's love for Jamie, the record does not support her assertion that she would be able to provide Jamie with the emotional, medical, and developmental support that he requires at this stage in his young life. From the totality of the circumstances, we conclude that clear and convincing evidence exists to support the trial court's conclusion that termination of Mother's parental rights is in Jamie's best interest.

## Conclusion

For the foregoing reasons, we affirm the juvenile court's order terminating Mother's parental rights to Jamie on the grounds of abandonment by willful failure to support and persistence of conditions. We affirm the juvenile court's order declining to terminate Mother's parental rights to Jamie on the ground of abandonment by willful failure to visit. We also affirm the juvenile court's order finding it in the best interest of Jamie to terminate Mother's parental rights. This case is remanded to the juvenile court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against Appellant Mother. Because Mother is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE